IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

ODESTER ANDREWS, EXCELL VANCE,
JOSEPHINE MARTIN, EDDIE FOSTER,
BILLY HARRIS, JOAN BERRYHILL,
PATRICIA CAMP, CLAYFERS WALTON                                                PLAINTIFFS

v.                                                          CIVIL ACTION NO. 3:24-CV-164-SA-RP

ENPRO INDUSTRIES, INC.; ENPRO HOLDINGS, INC.;
DETREX CORPORATION; ITALMATCH SC, LLC;
ITALMATCH DW, LLC; JOHN DOE CORPORATIONS 1-5                                  DEFENDANTS

ORDER AND MEMORANDUM OPINION

The above-named Plaintiffs initiated this civil action by filing their Complaint [1] on June 4, 2024. The Plaintiffs filed their Amended Complaint [10] on July 3, 2024. Before the Court is Enpro Industries, Inc. and Enpro Holdings, Inc.'s (collectively "Enpro") Motion to Dismiss for Failure to State a Claim [12]. The Motion [12] has been fully briefed and is ripe for review. The Court is prepared to rule.

*Relevant Factual and Procedural Background*

According to the Amended Complaint [10], the Plaintiffs are eight individuals that were exposed to trichloroethylene (TCE) while working at the automotive part manufacturing facility located at 600 Highway 32 East in Water Valley, Yalobusha County, Mississippi. Coltec Industries, Inc. owned the facility during the 1970s and 1980s when TCE was used.[1] The Plaintiffs have filed suit against Enpro as the successor to Coltec's liabilities.[2]

---

[1] The Amended Complaint [10] provides the following dates of the Plaintiffs' employment: Vance, 1977-2014; Martin, 1979-2022; Berryhill, 1973-2018; Foster, 1972-1996; Harris, 1976-1982; Camp, 1977-1979; Walton, 1973-2011. The Amended Complaint [10] does not provide Andrews' dates of employment.
[2] The Court notes that the Amended Complaint [10] is not a model of clarity with respect to which company employed the Plaintiffs and when that company would have transferred its liabilities to Enpro. According to the Amended Complaint [10], the Holley Automotive Division of Colt Industries, Inc. acquired the Water Valley facility in 1972. Colt Industries, Inc. was renamed Coltec Industries, Inc. in 1990. Coltec thereafter

The Amended Complaint [10] alleges that Coltec began using TCE, which is manufactured by Defendant Detrex Chemical Industries, Inc., in 1972. The Amended Complaint [10] describes TCE as follows:

> TCE, a clear, colorless, and non-flammable liquid with a sweet taste and smell, is a volatile organic compound, or "VOC," which is well known as both a degreasing solvent and human carcinogen. TCE is classified as a dense nonaqueous phase liquid, meaning it is heavier than water and, if discharged into the environment, will tend to sink down into the ground and contaminate the water table. TCE can remain volatile in the soil for decades and has the potential to degrade into other carcinogens, such as vinyl chloride.

[10] at p. 6.

According to the Amended Complaint [10], "TCE. . . was not considered safe to be used in cattle feed back in the 1950s due to concerns that the cattle developed hemorrhagic diseases and disorders[.]" *Id.* at p. 12-13. The Amended Complaint [10] further alleges that the Food and Drug Administration banned TCE for use in humans "as early as 1977." *Id.* at p. 13.

Employees at the Water Valley facility used TCE to clean automotive parts by taking them in and out of a degreasing unit. The Amended Complaint [10] alleges that Coltec stored TCE in a 4,000-gallon above-ground tank outside of the facility. It was connected to the degreaser unit via an underground pipe. Coltec additionally installed a 1,000-gallon above-ground tank to store TCE waste. That tank was also located outside of the facility and connected to the degreaser unit via underground pipe.

---

"directly or indirectly transferred, distributed, or otherwise conveyed all of its non-asbestos liabilities, including any and all environmental liabilities arising from the former operation of the Facility, to the Goodrich Corporation, which subsequently transferred. . . liabilities, either directly or indirectly, to Enpro Industries and/or Enpro Holdings." [10] at p. 4. Thus, the transfer proceeded from Coltec to Goodrich to Enpro. However, the Amended Complaint [10] alleges that the "Plaintiffs are former employees of BorgWarner, Inc." *Id.* at p. 13. BorgWarner's relationship to Enpro is unclear. Nevertheless, the parties agree that the Plaintiffs have filed suit against Enpro as the successor to their former employer, whether that be Coltec or BorgWarner. The parties further agree that Enpro is entitled to assert any defense available to its predecessors.

As the degreaser cleaned parts, it produced liquid waste, which flowed to the waste storage tank. The degreaser also created waste in the form of semi-solid sludge that remained at the bottom of the unit. The Amended Complaint [10] alleges that Coltec directed employees to remove the sludge by draining as much as possible into a 55-gallon drum and then manually scooping out the remaining sludge. The Amended Complaint [10] alleges that Coltec knew or should have known that the employees needed to wear personal protective equipment (PPE) while cleaning the sludge, but it did not inform, instruct, or require its employees to wear any PPE identified in the Detrex degreaser manual.

The Amended Complaint [10] further alleges that Coltec improperly disposed of its TCE waste. First, according to the Amended Complaint [10], on at least one occasion, Coltec directed employees to drain the 1,000-gallon waste tank into a ditch behind the facility. The Amended Complaint [10] alleges that an employee noticed approximately 20 dead turtles in the ditch the following day and reported it to his manager and several other employees.

Second, Coltec allegedly instructed its employees to spray the waste on the gravel parking lots and around buildings to "control weeds and knock down gravel dust." [10] at p. 8. Coltec additionally gave TCE to its employees to spray in their own yards and to the Yalobusha County Road Department to spray on roadways.

Moreover, the Amended Complaint [10] alleges that the 1,000-gallon tank would become so full that it overflowed from the tank's top vent and poured down onto the ground. After one spill, per the Amended Complaint [10], "the owner of a neighboring property approached Coltec management and informed them that her cattle were getting sick after drinking water [from] a ditch on Coltec's property." *Id.* The Amended Complaint [10] further alleges that TIWC Environmental Services, Inc., an environmental contractor hired by Coltec, documented multiple spills after 1976.

TIWC allegedly confirmed that the 4,000-gallon tank leaked TCE due to loose parts and that Coltec discharged waste into the environment when the 1,000-gallon tank became full.

According to the Amended Complaint [10], Coltec replaced the degreaser unit in 1981 and purchased several smaller degreasers as well. The Amended Complaint [10] alleges that though Coltec was now using more degreasers, "it did not take any measures to increase its capacity for storing or disposing of TCE waste and, until approximately 1983, did not retain a licensed chemical disposal company to handle the TCE waste[.]" *Id.* at p. 9.

Coltec allegedly quit using TCE in 1987. In 1988, Coltec tested the municipal well that supplied the facility's water and learned that it contained concentrations of TCE above the maximum contaminant level of 5 parts per billion. The Amended Complaint [10] alleges that Coltec then "began 'designing an action plan' which included disclosing the contamination to the Mississippi Department of Environmental Quality ('MDEQ'), 'initiat[ing] drinking water construction' by hiring a plumber to connect the Facility to the City of Water Valley water supply so that employees would have clean drinking water, prepar[ing] []an official Company position regarding the water supply, and[] communicat[ing] to its employees 'that [it was] connecting into the Water Valley city water system.'" *Id.* The Amended Complaint [10] asserts that Coltec did not issue a press release that informed the public about its contamination of the municipal well. However, Coltec informed employees not to drink water from fountains or sinks, that it would supply bottled water, and that it was working to connect to the City's water supply.

According to the Amended Complaint [10], MDEQ then conducted testing on a nearby domestic well, which revealed TCE concentrations above the maximum contaminant level. To determine whether Coltec had contaminated a significant aquifer in the area, MDEQ ordered Coltec to "develop and implement plans to identify the extent of TCE contamination in the area

4

surrounding the facility and remove it from the environment." *Id.* at p. 10. "At MDEQ's direction, Coltec began collecting and testing soil and groundwater samples from property located at or near the Facility, which, upon information and belief, contained concentrations of TCE <u>as high as 1,500,00 ppb</u>." *Id.* (emphasis in original).

Coltec then hired a third-party engineering firm to collect additional samples and determine the extent of contamination and develop a remediation plan. The Amended Complaint [10] alleges that the additional sampling revealed a "TCE plume" emanating from the facility and covering approximately 340 acres of land. *Id.* at p. 10. Enpro allegedly submitted diagrams of the plume to MDEQ.[3]

The Amended Complaint [10] alleges that a 1990 MDEQ order required Enpro to collect monthly samples from 2006 to 2015. For six years (2008-2013), Enpro allegedly sent a letter to MDEQ each month "wherein it represented that there was 'no discharge during the period' because of 'equipment malfunctions' or because the system was 'down for maintenance.'" *Id.* at p. 12. When Enpro started sending test results, they revealed approximately 17 monitoring wells with concentrations of TCE above maximum contaminant levels.

The Amended Complaint [10] further alleges that "Coltec's irresponsible and negligent discharge of TCE into the surrounding environment not only contaminated the ground and underlying water table, it also contaminated the air inside the facility" through "vapor intrusion" whereby the TCE in the ground seeps into the air through cracks in the facility's foundation. *Id.*

The Amended Complaint [10] asserts that the Plaintiffs were BorgWarner employees "exposed to drinking water and/or indoor [air] containing TCE" and exposed "through the

---

[3] The Amended Complaint [10] alleges that Coltec proposed using "thermal desorption" to remediate the contamination, but it suggests that Enpro was the party dealing with MDEQ. Thus, it appears that around this time, Coltec transferred its liability to Enpro.

5

groundwater, air, and vapor intrusion from the soil of the toxic plume that Defendants released upon the local community." *Id.* at p. 13. According to the Amended Complaint [10], all but one Plaintiff has been diagnosed with a form of cancer or other serious ailment linked to TCE exposure, such as Parkinson's disease.[4]

The Plaintiffs bring five claims against the Enpro Defendants: (1) nuisance/trespass; (2) negligence; (3) gross negligence; (4) negligent infliction of emotional distress; and (5) intentional infliction of emotional distress.[5] In the instant Motion [12], Enpro asserts that the Plaintiffs' trespass and/or nuisance claim should be dismissed because the Plaintiffs have not alleged that they have a property interest affected by TCE exposure. Enpro further assets that the remainder of Plaintiffs' claims are barred by the exclusivity provision of the Mississippi Workers' Compensation Act ("MWCA"). The Plaintiffs oppose the Motion [12].

*Legal Standard*

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 157 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, 129 S.

---

[4] The Court notes that Plaintiff Billy Harris' diagnoses are not listed in the Amended Complaint [10], but this appears to be a typographical error. The Amended Complaint [10] contains diagnoses for the remaining Plaintiffs.

[5] The Amended Complaint [10] lists four additional "counts" that are not causes of action but are instead doctrines related to the timeliness of the Plaintiffs' claims: (6) fraudulent concealment, (7) equitable estoppel, (8) continuing tort doctrine, (9) latent injuries. Additionally, in Count 10, the Plaintiffs bring a product liability claim against Detrex and its successor corporations, Italmatch SC, LLC and Italmatch DW, LLC. The product liability claim is not at issue in this Motion [12].

Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, 129 S. Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955).

In considering the motion, the Court must accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff, but the Court need not accept "legal conclusions, conclusory statements, or naked assertions devoid of further factual enhancement." *Edmiston v. Borrego*, 75 F.4th 551, 557 (5th Cir. 2023) (quoting *Benfield v. Magee*, 945 F.3d 333, 336 (5th Cir. 2019)).

*Analysis and Discussion*

As noted, Enpro argues that the Plaintiffs' claims are barred by the MWCA exclusivity provision and that the Plaintiffs fail to plausibly allege a nuisance or trespass claim. The Court will address the parties' arguments in turn.

I. *MWCA Exclusivity*[6]

The MWCA provides that workers' compensation is the exclusive remedy for employees who sustain injuries arising out of their employment. *See* MISS. CODE ANN. § 71-3-9 ("The liability

---

[6] The Plaintiffs spend much of their Response [33] arguing that the MWCA exclusivity issue should not be decided at the pleading stage. According to the Plaintiffs, Enpro must prove as an affirmative defense that it obtained workers' compensation coverage before the issue of exclusivity may be decided at summary judgment. The Plaintiffs cite a number of cases that plainly do not support their position, and the Court sees no need to individually address them. Generally speaking, "[i]f, based on the facts pleaded and judicially noticed, a successful affirmative defense appears, then dismissal under Rule 12(b)(6) is proper." *Hall v. Hodgkins*, 305 F. App'x 224, 227–28 (5th Cir. 2008) (citing *Kansa Reinsurance Co., Ltd. v. Cong. Mortgage Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994)). And in this specific context, Mississippi courts and federal courts applying Mississippi law routinely grant motions to dismiss based on workers' compensation exclusivity. *See, e.g., Bowden v. Young*, 120 So.3d 971, 976 (Miss. 2013) (reversing, on interlocutory appeal, district court's failure to dismiss alleged intentional tort claims against employer pursuant to MWCA exclusivity); *Schaffner Manuf. Co., Inc. v. Powell*, 331 So.3d 11, 14 (Miss. 2022) (same); *Byars v. Asbury Mgmt. Servs., LLC*, 2020 WL 7205356, at *2 (S.D. Miss. Dec. 7, 2020) (granting motion to dismiss negligence-based claims pursuant to MWCA exclusivity); *McNeil v. Quality Logistics Systems, Inc.*, 2016 WL 6999483, at *4 (S.D. Miss. Nov. 30, 2016) (same).

of an employer to pay compensation shall be *exclusive* and in place of all other liability of such employer to the employee. . . on account of such injury or death.") (emphasis added).[7] Under certain circumstances, however, a claim for an intentional tort may not be subject to the MWCA's exclusivity provision. *See Griffin v. Futorian Corp.*, 533 So.2d 461, 463 (Miss. 1988).

"[The Mississippi Supreme Court] repeatedly has held that, in order for a willful tort to be outside the exclusivity of the MWCA, the employer's action must be done with an actual intent to injure the employee." *Bowden v. Young*, 120 So.3d 971, 976 (Miss. 2013) (quoting *Griffin*, 533 So.2d at 464) (internal alterations and quotations omitted). "'[A] mere willful and malicious act is insufficient to give rise to the intentional tort exception to the exclusive remedy provisions of the [MWCA]. . . Reckless or grossly negligent conduct is not enough to remove a claim from the exclusivity of the [MWCA]'. . . [T]he plaintiff must allege and prove that the employer acted with an actual intent to injure the employee, with full knowledge that the employee would be injured and with the purpose of the action being to cause injury to the employee." *Id.* (quoting *Blailock v. O'Bannon*, 795 So.2d 533, 535 (Miss. 2001)).

The Plaintiffs do not dispute that their negligence-based claims (negligence, gross negligence, and negligent infliction of emotional distress) are barred by the MWCA. The Plaintiffs argue that their intentional infliction of emotional distress claim should not be dismissed because the Amended Complaint [10] adequately alleges intentional acts.[8] The Plaintiffs rely on several

---

[7] The Amended Complaint [10] sufficiently alleges that the Plaintiffs were injured in the course and scope of their employment. *See, e.g.*, [10] at p. 2-3 ("Ms. Andrews worked in the Facility. . . and was exposed to [TCE] through drinking water which was contaminated with [TCE] at the Facility and/or through the intrusion of [TCE] vapors into the Facility's internal atmosphere. . . Ms. Camp was exposed to [TCE] while working at the Facility. . . at or near the time when the Holley Automotive Division of Colt Industries, Inc. was actively using [TCE] as a solvent and degreaser[.]").

[8] The Court notes that under Count 5: Intentional Infliction of Emotional Distress, the Amended Complaint [10] makes conclusory assertions that the Defendants intentionally and knowingly exposed the Plaintiffs to TCE and intentionally poisoned residents. *See* [10] at p. 20. No facts are tied to these allegations. The Court

instructive cases examining whether an employer acted with an "actual intent" to injure in the context of toxic exposures. The Court will address them in turn.

Start with *Franklin Corp. v. Tedford*, 18 So. 3d 215 (Miss. 2009)—the case upon which the Plaintiffs chiefly rely. There, the plaintiffs were employees at Franklin Corporation's furniture manufacturing plant where they utilized Mid-South Adhesive, Inc.'s Soft Seam adhesive product. *Id.* at 219. When Mid-South initially presented the product to Franklin, it provided Franklin a "Material Safety Data Sheet" and warning label for the adhesive product, which indicated, among other things, that the product contained a neurotoxin and should be used with adequate ventilation and a full-face respirator. *Id.* at 222.

Franklin began using the adhesive in 1999 and did not install mechanical ventilation on the "glue line" where the plaintiffs worked. *Id.* at 223. Franklin moved the glue line to a new building in September 2000 and again did not install mechanical ventilation. *Id.* Some of the plaintiffs were required to apply the adhesive in small, unventilated booths without respiratory masks or protective equipment. *Id.* at 224. On one occasion, following a spill of approximately 330 gallons of the adhesive, two employees were instructed—by a manager to whom they had complained about illness related to the adhesive—to clean up the spill without protective equipment. *Id.* at 226.

In 2001, an "Industrial Hygiene Evaluation" was performed on behalf of Franklin's workers' compensation insurer. *Id.* at 223. The report found that an employee was exposed to the adhesive in an amount well above the manufacture's recommended limits. *Id.* The report further "strongly recommended" substitution of the gluing agent, ventilation, air monitoring, a respiratory-protection program, and informing the glue-line employees of the present exposure levels. *Id.*

---

will look to the facts of the Amended Complaint [10] to determine whether the Plaintiffs have plausibly alleged that Enpro acted intentionally. *See Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937.

Franklin did not implement the report's recommendations or inform the employees of the report's results. *Id.*

Numerous glue-line employees complained to their supervisors and upper management about the need for ventilation and protective equipment and about symptoms of illness, which increased while working in the booths. *Id.* at 224. Vice President Lyles, a manager who repeatedly maintained that the company would not install ventilation, at one point stated that "if they start dropping like flies. . . we can replace them today[.]" *Id.* at 225. On another occasion, when an employee complained that the adhesive was burning his hands, Lyles "smiled and walked off." *Id.* Lyles later directed a manager "to keep all information away from employees." *Id.* at 226. In accordance with those instructions, the manager removed the safety data sheets from the adhesive containers and drums. *Id.*

Several glue-line employees were eventually hospitalized and later filed suit against Franklin for battery and intentional infliction of emotional distress. *Id.* at 228. The trial court denied Franklin's motion to dismiss the claim pursuant to MWCA exclusivity, finding that the plaintiffs alleged sufficient facts to show Franklin acted with an "actual intent" to injure. *Id.* at 232. The Mississippi Supreme Court found no error in the ruling. *Id.*

Here, the Plaintiffs contend that the facts of this case are "strikingly similar" to *Franklin*. [34] at p. 16. There are some similarities between the cases, as noted by the Plaintiffs. For example, Enpro, like Franklin, allegedly failed to provide the protective equipment recommended in the TCE degreaser's safety manual. Enpro was also allegedly aware that TCE was dangerous to humans in light of the safety manual and the reports regarding the death of and illness in animals near the facility.

10

However, the Plaintiffs point to several alleged similarities for which the Court finds no support in the Amended Complaint [10]. First, the Plaintiffs contend that like in *Franklin*, Enpro was aware of repeated occasions where employees experienced illness due to their contact with the dangerous chemicals. On the contrary, the Amended Complaint [10] contains no allegations that employees became sick or complained of becoming sick while working at the facility.

Further, the Plaintiffs contend that like in *Franklin*, Enpro "*willingly* misled employees about the nature of the danger." [34] at p. 16. The Plaintiffs liken Enpro's failure to provide protective equipment with Franklin's purposeful removal of the safety data sheets. The Court finds this comparison tenuous. The employees in *Franklin* frequently complained about illness and the need for ventilation, and the company responded by specifically instructing managers "to keep all information away from employees" and removing the safety data sheets that showed safe exposure levels. *Id.* at 224-26. Even after employees were hospitalized, Franklin continued to use the adhesive without ventilation and without informing employees of a test that showed overexposure. *Id.* at 227.

Here, the Plaintiffs' Amended Complaint [10] does not allege that Enpro hid safety information or test results from employees. Instead, the Amended Complaint [10] indicates that Enpro began remediation measures after it discovered contamination in a well. This brings the Court to the Mississippi Supreme Court's 2013 decision in *Bowden*, 120 So.3d 971.

In *Bowden*, the plaintiffs were employees at V & B, a law office ridden with toxic mold. *Id.* at 973. The plaintiffs brought battery and intentional infliction of emotional distress claims against V & B, alleging that they were intentionally exposed to toxic mold and a toxic mold killer spray. *Id.* at 978. As to the battery claim, the plaintiffs alleged that the law firm battered them when it failed to remediate the mold. *Id.* at 979. The Mississippi Supreme Court found that the trial court

11

should have dismissed the claim based on workers' compensation immunity. *Id.* The court reasoned that the firm's attempt to spray the mold did not support an allegation of "actual intent": "Several of the alleged acts of battery involved the use of the Mold Killer Spray, which was being used to kill the mold causing injury to the plaintiffs. It is not possible that the defendants were allowing the mold to exist with the intent of injuring the plaintiffs while at the same time attempting to destroy the mold." *Id.* at 979.

As in this case, the plaintiffs in *Bowden* attempted to frame the facts in a way that mirrored those in *Franklin*. *Id.* They pointed to the fact that the law firm failed to post safety data sheets regarding the effects of the mold killer spray. *Id.* Noting that the defendants in *Franklin* purposefully *removed* safety data sheets from the adhesive that employees were forced to spray without ventilation, the court found that the spraying of mold killer in an attempt to combat the mold problem was "not a situation remotely similar" to that in *Franklin*. *Id.* (emphasis added).

With respect to the intentional infliction of emotional distress claim, the *Bowden* plaintiffs alleged that V & B engaged in a pattern of dishonestly to cast doubt on the plaintiffs' suspicions about the existence of the mold and their own symptoms. *Id.* The plaintiffs alleged that the firm hid a lab report, "which indicated that the mold level in the office was more than five times greater than OSHA recommendations." *Id.* at 980. However, the Mississippi Supreme Court noted that "in the same statement of facts, the plaintiffs admit[ted] that V & B admitted that the October Lab Report indicated high levels of mold in the office and that the firm 'decided to move out of the 1617 office.'" *Id.*

The Mississippi Supreme Court ultimately held that the intentional infliction of emotional distress claim should have been dismissed as well, reasoning as follows:

> V & B initially denied that there was any mold in the building. Management suggested other potential causes of the plaintiffs'

> ailments. When it became apparent that mold was in fact present in the building, V & B attempted to remediate the situation by applying the Mold Killer Spray. Once the October Lab Report was received, V & B specifically informed the plaintiffs that it would search for new office space. While the defendants' handling of the mold problem may have been negligent, the allegations do not rise to the level of outrageous and extreme conduct that is necessary to support a claim for intentional infliction of emotional distress. Further, the plaintiffs still must be able to show that the actions of the defendants were conducted with "actual intent" to injure the plaintiffs. The fact that V & B attempted to remediate the mold issue, and ultimately decided to relocate its offices due to the mold, leads to the inevitable conclusion that the actions of V & B were not done with the actual intent to inflict emotional distress upon the plaintiffs.

*Id.*

Here, the Amended Complaint [10] similarly suggests that Enpro did not act with an "actual intent" to injure its employees. As noted, it contains no allegations that Enpro actively hid test results and safety data sheets from sick employees. Instead, like in *Bowden*, the Amended Complaint [10] suggests that Coltec took remedial measures after learning of TCE contamination.

There are two mentions of tests and/or reports in the Amended Complaint [10]. First, the Plaintiffs allege that multiple spills occurred after 1976, as documented by TIWC, an environmental contractor hired by Coltec. *See* [10] at p. 8. There are no allegations explaining when TIWC investigated the spills or what actions Coltec took in response to the investigation. The sole fact that TIWC investigated spills (and apparently generated some sort of report) is not enough to demonstrate that Coltec engaged in "intentional behavior designed to bring about [] injury." *Franklin*, 18 So. 3d at 232.

Second, the Amended Complaint [10] alleges that in 1988, Coltec tested the municipal well that supplied water to the facility and found that it was contaminated with TCE. According to the Amended Complaint [10], shortly thereafter, Coltec began "designing an action plan," which included connecting to the city's water supply, communicating with employees about connecting

13

to the city's water supply, and providing water bottles. [10] at p. 9. Coltec then disclosed the contamination to MDEQ, hired an engineering firm, and began to develop a remediation plan. *Id.* at p. 10. Like in *Bowden*, Coltec's decision to provide water bottles and develop a remediation plan does not support allegations of an "actual intent" to injure employees.

Relatedly, the Plaintiffs argue that Enpro "lied to the State of Mississippi about its efforts to monitor and handle the pollution." [34] at p. 16. This presumably refers to the Amended Complaint's [10] allegations regarding the 1990 MDEQ order. Per the 1990 order, Enpro was required to test samples from monitoring wells on a monthly basis from 2006 through 2015. The Amended Complaint [10] alleges that from June 2008 through June 2013, Enpro reported to MDEQ that there was "no discharge during the period" due to equipment malfunctions or maintenance. [10] at p. 12. The Court fails to see how this reporting demonstrates that Enpro acted "with full knowledge that the employee[s] would be injured and with the purpose of the action being to cause injury to the employee[s]," particularly in light of the fact that the Amended Complaint [10] alleges that Enpro complied with the 1990 order at some other time. *Bowden*, 120 So. 3d at 976. Moreover, at least three Plaintiffs were no longer working at Enpro in 2008. Thus, even if the Amended Complaint [10] successfully alleged that Enpro's deficient reporting constituted an "actual intent" to injure its employees, the Amended Complaint [10] fails to connect Enpro's actions beginning in 2008 to the injuries of the Plaintiffs that no longer worked at the facility.

The Plaintiffs additionally rely on *Taylor v. Nissan North America*, 2017 WL 2727276 (S.D. Miss. June 23, 2017). There, the plaintiff alleged that his employer, Nissan, knew that he was being exposed to formaldehyde gas at levels significantly above OSHA's permissible exposure limit but required him to work without PPE. *Id.* at *2. After having a seizure, the

plaintiff's physician instructed him not to return to work until cleared by a neurologist. *Id.* In response, Nissan initiated a workers' compensation claim. *Id.* Nissan's on-site medical clinic diagnosed the plaintiff with "chemical gas exposure," setting a work restriction of "no contact with formaldehyde gas." *Id.* Despite the restriction and the physician's order, Nissan returned the plaintiff to full duty. *Id.* The plaintiff followed up with a neurologist who recommended that he be transferred to a different work area or be provided a respirator if required to remain in the area. *Id.* Nissan thereafter required the plaintiff to work in the same area without a respirator, and the plaintiff again experienced seizure-related symptoms. *Id.* Based on these facts, and the plaintiff's allegation that Nissan provided misleading sampling of the formaldehyde emissions, the court found that the plaintiff plausibly alleged that Nissan acted with an "actual intent" to injure. *Id.* at *3. Here, as noted, the Plaintiffs do not allege that they reported TCE-related illnesses to Enpro or that Enpro provided false or misleading test results. The Court finds that the facts in the Amended Complaint [10] are unlike those in *Taylor* that plausibly alleged an "actual intent" to injure.

In summary, the Amended Complaint [10] alleges that that Enpro was aware of the dangers of TCE but failed to protect the Plaintiffs by providing safety equipment or properly disposing of TCE waste. While Enpro's actions *may* have been negligent or grossly negligent, the allegations in the Amended Complaint [10] do not demonstrate that Enpro acted with "actual intent to injure the employee, with full knowledge that the employee would be injured and with the purpose of the action being to cause injury to the employee." *Bowden*, 120 So.3d at 976. Notably, in declining to extend the "actual intent" standard to include behavior that is "substantially certain" to result in injury, the Mississippi Supreme Court in *Franklin* specifically found that claims of this nature do not demonstrate an "actual intent" to injure:

> [I]n order for a willful tort to be outside the exclusivity of the Act, the employee's action must be done "*with an actual intent to injure*

15

> *the employee*. It is not enough to destroy the immunity that the employer's conduct leading to the injury consists of aggravated negligence or even that the conduct goes beyond this to include such elements as knowingly permitting hazardous conditions to exist or willfully failing to furnish a safe place to work or knowingly ordering the employee to perform a dangerous job."

18 So. 3d at 231 (quoting *Griffin*, 533 So.2d at 464) (emphasis in original).

The Court therefore finds that, as currently pled, the Plaintiffs have not sufficiently alleged that Enpro acted with an "actual intent" to injure them. Accordingly, the MWCA is their exclusive remedy, and their intentional infliction of emotional distress claim should be dismissed. However, "[w]hen a claim is subject to dismissal under Rule 12(b)(6) for failure to state a claim, 'district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies. . . unless it is clear that the defects are incurable[.].'" *Williams v. 1960 Fam. Prac. PA*, 2020 WL 4227592, at *3 (S.D. Tex. June 29, 2020), *report and recommendation adopted*, 2020 WL 4227531 (S.D. Tex. July 21, 2020) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F. 3d 305, 329 (5th Cir. 2002)). As such, the Court will allow the Plaintiffs to amend their complaint to cure the defects of their intentional infliction of emotional distress claim.

As noted, the Plaintiffs do not dispute that their negligence-based claims (negligence, gross negligence, and negligent infliction of emotional distress) are barred by the MWCA. Those claims are dismissed.

## II.     *Trespass and/or Nuisance Claim*

The Plaintiffs additionally bring trespass and public and private nuisance claims against Enpro. In Mississippi, "[l]iability for trespass requires proof of: (1) interference with the right of exclusive possession of one's land and (2) an invasion that is the 'direct result of some act committed by the defendant.'" *Gaw v. Seldon*, 85 So. 3d 312, 318 (Miss. Ct. App. 2012) (quoting *Thomas v. Harrah's Vicksburg Corp.,* 734 So. 2d 312, 315 (Miss.Ct.App.1999)). "Additionally,

16

because trespass is an intentional tort, there must be proof that the trespasser 'inten[ded] to enter upon the particular piece of land in question.'" *Id.* (quoting *Thomas*, 734 So. 2d at 316).

Separately, "[a] private nuisance is a nontrespassory invasion of another's interest in the use and enjoyment of his property." *Id.* at 317 (quoting *Biglane v. Under the Hill Corp.,* 949 So.2d 9, 14 (Miss.2007)). "Liability for a private nuisance requires 'an invasion of another's interest in the private use and enjoyment of land [where] that invasion is either (a) intentional and unreasonable, or (b) unintentional but otherwise provides the basis for a cause of action for negligent or reckless conduct or for abnormally dangerous conditions or activities.'" *Id.* (quoting *Biglane*, 949 So.2d at 14).

Clearly, trespass and private nuisance claims require interference with another's interest in his property. *See id.* at 317-18. Here, the Amended Complaint [10] contains no allegations that the Plaintiffs have a possessory interest in property near the facility that may have been impacted by the alleged TCE plume. The only specific information the Amended Complaint [10] provides about the Plaintiffs is their addresses, dates of employment, diagnoses, and that they were exposed to TCE while working at the Water Valley facility.

The Amended Complaint [10] does contain two vague allegations suggesting that the Plaintiffs may have lived in Water Valley at one time. First, the Amended Complaint [10] alleges that the Plaintiffs "continued to be exposed to TCE through the groundwater, air, and vapor intrusion from the soil of the toxic plume that the Defendants released upon the local community." [10] at p. 15. Second, the Amended Complaint [10] alleges that "[a]ll of the Plaintff(s) attached to this suit suffer from health and/or emotional distress issues stemming directly from the prolonged and continuous poisoning of the air, water, soil, and people within the communities of Water Valley[.]" *Id.* at p. 15. Even with these suggestions that the Plaintiffs were members of the Water

17

Valley community in some capacity, the Amended Complaint [10] contains no factual allegations that Enpro interfered with any particular Plaintiff's possessory interest in his or her property. As such, the Court is unable to reasonably infer that Enpro is liable for trespass or private nuisance. *See Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937.

Lastly, the Mississippi Supreme Court, relying on the Restatement (Second) of Torts, has outlined the following elements of a public nuisance:

> (1) A public nuisance is an unreasonable interference with a right common to the general public.
>
> (2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
>
> > (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
> >
> > (b) Whether the conduct is prescribed by a statute, ordinance or administrative regulation, or
> >
> > (c) Whether the conduct is of a continuing nature or has produced a permanent or longlasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

*Comet Delta, Inc. v. Pate Stevedore Co. of Pascagoula, Inc.*, 521 So. 2d 857, 861 (Miss. 1988) (quoting RESTATEMENT (SECOND) OF TORTS, § 821B).

"To be considered public, the nuisance must affect an interest common to the general public, rather than peculiar to one individual, or several. . . It is not necessary, however, that the entire community be affected, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right." *Id.* (quoting PROSSER AND KEETON ON THE LAW OF TORTS, § 90 at 645 (5th Ed. 1984); citing *Robinson v. Indianola Muni. Separate Sch. Dist.*, 467 So. 2d 911, 918 (Miss. 1985)) (additional citations omitted). Moreover, "[t]o recover damages the

18

plaintiff usually must have sustained harm different in kind, rather than in degree, than that suffered by the public at large." *Id.* (citing *Robinson*, 467 So. 2d at 918) (additional citations omitted).

For example, in *Adams v. Adient US LLC*, 2022 WL 4131768, at *1 (W.D. Tenn. Sept. 12, 2022), the plaintiffs brought a public nuisance claim related to the discharge of TCE against the owner of an industrial site in Tennessee. The plaintiffs consisted of over 400 individuals and entities who owned property near the industrial site. *Id.* Applying similar public nuisance law, the United States District Court for the Western District of Tennessee found that the plaintiffs plausibly stated a public nuisance claim where they alleged (1) that their community groundwater was contaminated with highly toxic chemicals and (2) that they suffered special injuries in that the pollution lowered the value of their land. *Id.* at *8.

Here, the TCE-contaminated soil (causing groundwater contamination and vapor intrusion) described in the Amended Complaint [10] may rise to the level of a public nuisance. *See, e.g., Comet Delta*, 521 So. 2d at 860-61 (finding "allegation of black, greasy, airborne coal dust" implied "a significant interference with the general public welfare, thereby raising a claim of unreasonable interference with a public right"). However, the Amended Complaint [10] does not clearly allege that the Plaintiffs suffered damages as members of the public exercising a public right. The Plaintiffs allege that they were exposed to TCE while working at the facility, but they also vaguely allege that they were continuously exposed to TCE as members of the community. *See* [10] at p. 1-2.

As noted, the Plaintiffs must allege that they "sustained harm different in kind, rather than in degree, than that suffered by the public at large." *Comet Delta*, 521 So. 2d at 861. The degree of harm may be still relevant to the determination of whether the Plaintiffs have sustained a harm

that is different in kind than that suffered by the public at large. *See id.* This is because plaintiffs experiencing a greater degree of the same kind of harm often have that experience because they are exercising a special interest not common to the public. *See Restatement (Second) of Torts* § 821C cmt. C. The Amended Complaint [10] does not suggest that the Plaintiffs have sustained a different kind of harm or a greater degree of harm than that sustained by the public.

The Court finds that the Amended Complaint [10] fails to state a claim for trespass or public or private nuisance. For the same reasons noted in the preceding section, the Court will allow the Plaintiffs to amend their complaint to cure the defects of the claims discussed herein.

*Conclusion*

For the reasons set forth above, Enpro's Motion to Dismiss [12] is GRANTED in part and DENIED *without prejudice* in part. The Plaintiffs' negligence, gross negligence, and negligent infliction of emotional distress claims are DISMISSED *with prejudice*.

The Plaintiffs are hereby ORDERED to file a second amended complaint within fourteen (14) days of today's date. The second amended complaint should address the deficiencies articulated above. Should the Plaintiffs fail to timely file a second amended complaint, the Court will dismiss the Plaintiff's claims against Enpro without further notice for failure to prosecute.

SO ORDERED, this the 17th day of March, 2025.

/s/ Sharion Aycock  
UNITED STATES DISTRICT JUDGE