**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**ODESTER ANDREWS, EXCELL VANCE,**                           **PLAINTIFFS**
**JOSEPHINE MARTIN, EDDIE FOSTER,**
**BILLY HARRIS, JOAN BERRYHILL**
**PATRICIA CAMP, and CLAYFERS WALTON**

**V.**                                        **CAUSE NO.: 3:24-CV-164-SA-RP**

**ENPRO INDUSTRIES, INC.; ENPRO**                        **DEFENDANTS**
**HOLDINGS, INC.; DETREX CORPORATION;**
**ITALMATCH SC, LLC; ITALMATCH DW, LLC;**
**JOHN DOE CORPORATIONS 1-5**

---

**SECOND AMENDED COMPLAINT**
*JURY TRIAL DEMANDED*

---

**COME NOW**, Plaintiffs Odester Andrews, Excell Vance, Josephine Martin, Eddie Foster, Billy

Harris, Joan Berryhill, Patricia Camp, and Clayfers Walton, by and through their undersigned counsel, and

assert the following causes of action against Defendants Enpro Industries, Inc., Enpro Holdings, Inc.,

Detrex Corporation, Italmatch SC, LLC, Italmatch DW, LLC, and John Doe Corporations 1-5 as follows:

## INTRODUCTION

1.      For more than fifty years, the Defendants in this lawsuit have engaged in continuous acts

which have had the result of poisoning the people, environment, and the community of Water Valley,

Mississippi, and Yalobusha County.  The purpose of this lawsuit is to seek justice on behalf of the victims,

and to right the wrongs done to the local community by the Defendants.

## PARTIES

2.      Plaintiff Odester Andrews is an adult resident citizen of the State of Mississippi who resides

at 104 Patton Lane, Batesville, Panola County, Mississippi.  Ms. Andrews worked in the Facility located at

600 Highway 32 East, Water Valley, Yalobusha County, Mississippi while it was owned and/or operated by

for the Holley Automotive Division of Colt Industries, Inc., Colt Industries, Inc., Coltec Industries, Inc.,

Enpro Industries, Inc., and/or Enpro Holdings, Inc.[1] from 1972 through 1996 and BorgWarner, Inc. from 1996 until 2015. During that time, she was exposed to trichloroethylene through drinking water which was contaminated with trichloroethylene at the Facility and/or through the intrusion of trichloroethylene vapors into the Facility's internal atmosphere. Plaintiff Odester Andrews is a victim of trichloroethylene exposure at the Facility, as she was diagnosed with B-cell lymphoma in 2022 and colon cancer in 2023.

3. Plaintiff Excell Vance is an adult resident citizen of the State of Mississippi who resides at 104 Navajo Circle, Clinton, Hinds County, Mississippi. Mr. Vance worked in the Facility located at 600 Highway 32 East, Water Valley, Yalobusha County, Mississippi while it was owned and/or operated by the Holley Automotive Division of Colt Industries, Inc., Colt Industries, Inc., Coltec Industries, Inc., Enpro Industries, Inc., and/or Enpro Holdings, Inc. from 1977 through 1996, and BorgWarner, Inc. from 1996 until 2014. During that time, he was exposed to trichloroethylene at the facility through contaminated drinking water, skin contact with the chemical, and/or through the intrusion of trichloroethylene vapors into the Facility's internal atmosphere. Plaintiff Excell Vance is a victim of trichloroethylene exposure at the Facility and was recently diagnosed with multiple myeloma.

4. Plaintiff Josephine Martin is an adult resident citizen of the State of Mississippi who resides at 78 County Road 440, Coffeeville, Yalobusha County, Mississippi. Ms. Martin worked in the Facility located at 600 Highway 32 East, Water Valley, Yalobusha County, Mississippi while it was owned and/or operated by the Holley Automotive Division of Colt Industries, Inc., Colt Industries, Inc., Coltec Industries, Inc., Enpro Industries, Inc., and/or Enpro Holdings, Inc. from 1979 through 1996, and BorgWarner, Inc. from 1996 until 2022. During that time, she was exposed to trichloroethylene through contaminated drinking water at the Facility, skin contact with the chemical, and/or through the intrusion of

---

[1] It is unclear from publicly available documents which entity owned and/or operated the Facility prior to its sale to BorgWarner, Inc. or when any such ownership and/or operation occurred. However, Enpro Industries, Inc. has represented to its investors that the sale of the Facility occurred in 1996 and that Enpro Holdings, Inc. had been managing liabilities at the site since that time, though it also informed the Mississippi Department of Environmental Quality that it did not acquire any liability for the Facility until 2002. *See* Ex. 1, Enpro Industries, Inc. Securities and Exchange Commission Form 10-Q dated November 5, 2019, at p. 23; Ex. 2, Agreed Order dated February 5, 2016 in Mississippi Commission on Environmental Quality Cause No. 6617 16.

trichloroethylene vapors into the Facility's internal atmosphere. Plaintiff Josephine Martin is a victim of trichloroethylene exposure at the Facility, having been diagnosed and treated for left breast cancer and Stage IV kidney disease.

5. Plaintiff Joan Beryhill is an adult resident citizen of the State of Mississippi who resides at 704 Airways Acres, Apt. 35, Water Valley, Mississippi. Ms. Berryhill worked in the Facility located at 600 Highway 32 East, Water Valley, Yalobusha County, Mississippi while it was owned and/or operated by the Holley Automotive Division of Colt Industries, Inc., Colt Industries, Inc., Coltec Industries, Inc., Enpro Industries, Inc., and/or Enpro Holdings, Inc. from 1973 through 1996, and BorgWarner, Inc. from 1996 until 2018. During that time, she was exposed to trichloroethylene through contaminated drinking water at the Facility, through skin contact with the chemical, and/or through the intrusion of trichloroethylene vapors into the Facility's internal atmosphere. Plaintiff Joan Berryhill is a victim of trichloroethylene exposure at the Facility and was recently diagnosed with multiple myeloma.

6. Plaintiff Eddie Foster is an adult resident citizen of the State of Mississippi who resides at 202 Church Street, Water Valley, Yalobusha County, Mississippi. Mr. Foster worked in the Facility located at 600 Highway 32 East, Water Valley, Yalobusha County, Mississippi while it was owned and/or operated by the Holley Automotive Division of Colt Industries, Inc., Colt Industries, Inc., Coltec Industries, Inc., Enpro Industries, Inc., and/or Enpro Holdings, Inc. from approximately 1972 to 1996 and was exposed to trichloroethylene through contaminated drinking water at the Facility, skin contact with the chemical, and/or through the intrusion of trichloroethylene vapors into the Facility's internal atmosphere. Plaintiff Eddie Foster is a victim of trichloroethylene exposure at the Facility and was recently diagnosed with prostate cancer in 2019 and cancer in his left kidney in 2023.

7. Plaintiff Billy Harris is an adult resident citizen of the State of Mississippi who resides at 424 County Road 167, Coffeeville, Yalobusha County, Mississippi. Mr. Harris worked in the Facility located at 600 Highway 32 East, Water Valley, Yalobusha County, Mississippi while it was owned and/or operated by the Holley Automotive Division of Colt Industries, Inc., Colt Industries, Inc., Coltec Industries, Inc., Enpro Industries, Inc., and/or Enpro Holdings, Inc. from approximately 1976 to 1982 and was exposed

to trichloroethylene through contaminated drinking water at the Facility, skin contact with the chemical, and/or through the intrusion of trichloroethylene vapors into the Facility's internal atmosphere. Plaintiff Billy Harris is a victim of trichloroethylene exposure at the Facility and was suffers from nervous system disorders, tremors, and prostate disease.

8. Plaintiff Patricia Camp is an adult resident citizen of the State of Mississippi who resides at 1414 James Street, Water Valley, Yalobusha County, Mississippi. Ms. Camp was exposed to trichloroethylene while working at the Facility located at 600 Highway 32 East, Water Valley, Yalobusha County, Mississippi from 1977 to 1979 for the Holley Automotive Division of Colt Industries, Inc. at or near the time when it was actively using trichloroethylene as a solvent and degreaser in the production of automotive parts. Plaintiff Patricia Camp is a victim of trichloroethylene exposure, as she was diagnosed with Parkinson's disease in 2021 and was diagnosed with cancer in her right breast this year.

9. Plaintiff Clayfers Walton is an adult resident citizen of the State of Mississippi who resides at 12239 Highway 51, Oakland, Yalobusha County, Mississippi. Mr. Walton worked for the Holley Automotive Division of Colt Industries, Inc. at the Facility located at 600 Highway 32 East, Water Valley, Yalobusha County, Mississippi from 1973 to 2011 and was exposed to raw trichloroethylene during the time that the Holley Automotive Division of Colt Industries, Inc. was actively using the chemical as a solvent and degreaser in the production of automotive parts. He was further exposed to trichloroethylene through contaminated drinking water and indoor air at the Facility. Plaintiff Clayfers Walton is a victim of trichloroethylene exposure and was diagnosed with Parkinson's disease in 2020.

10. Defendant Enpro Industries, Inc. ("**Enpro Industries**") is a corporation organized and existing under the laws of the state of North Carolina which maintains its principal place of business at 5605 Carnegie Blvd., Suite 500, Charlotte, North Carolina 28209-4674. Enpro Industries may be served with process by service upon its registered agent, C.T. Corporation System, 150 Fayetteville St., Box 1011, Raleigh, North Carolina 27601-2957. Based on information disclosed to the Mississippi Department of Environment Quality, in May 2002, Enpro Industries, either directly or indirectly through one of its subsidiaries, expressly assumed and/or acquired all environmental liabilities of the Holley Automotive

Division of Colt Industries, Inc., Colt Industries, Inc., and/or Coltec Industries, Inc. for contamination of the premises located at 600 Highway 32 East, Water Valley, Yalobusha County, Mississippi, as well as the spread of the contamination offsite to the surrounding areas near the town of Water Valley.

11. Defendant Enpro Holdings, Inc. ("**Enpro Holdings**"), is a corporation organized and existing under the laws of the state of North Carolina which maintains its principal place of business at 5605 Carnegie Blvd., Suite 500, Charlotte, North Carolina 28209-4674. Enpro Holdings may be served with process by service upon its registered agent, C.T. Corporation System, 150 Fayetteville St., Box 1011, Raleigh, North Carolina 27601-2957. Upon information possessed by Plaintiffs at this time, Enpro Holdings is a wholly owned subsidiary of Enpro Industries which expressly assumed and/or acquired all environmental liabilities of the Holley Automotive Division of Colt Industries, Inc., Colt Industries, Inc., and/or Coltec Industries, Inc. for the premises located at 600 Highway 32 East, Water Valley, Yalobusha County, Mississippi. Upon further information possessed by Plaintiffs at this time, Coltec Industries, Inc. (formerly Colt Industries, Inc.), the former owner of the Facility, directly or indirectly transferred, distributed, or otherwise conveyed all of its non-asbestos liabilities, including any and all environmental liabilities arising from the former operation of the Facility, to the Goodrich Corporation which subsequently transferred, distributed, or otherwise conveyed said liabilities, either directly or indirectly, to Enpro Industries and/or Enpro Holdings.

12. Defendants Italmatch SC, LLC and Italmatch DW, LLC, are two separate limited liability corporations formed under the laws of the State of Delaware. The two entities maintain the same agent for service of process, said registered agent being Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. According to documents obtained by Plaintiffs from the Delaware Secretary of State's office, neither entity publicly disclosed the identities of its members and such information is not required to be disclosed under the laws of the State of Delaware. Despite extensive and good faith efforts by Plaintiffs to determine the identity of the members of these companies, that information cannot be acquired by the Plaintiffs at this time. Though they are unable to definitively identify the members of Italmatch SC, LLC and Italmatch DW, LLC, Plaintiffs affirmatively assert that neither of the Delaware

limited liability companies are registered to do business in the State of Mississippi and that they have no knowledge whatsoever which indicates, or tends to indicate, that any of the members of either limited liability company are residents of the State of Mississippi, have minimum contacts with the State of Mississippi, or maintain their principal place of business in the State of Mississippi.

13.     Defendant Detrex Corporation is a corporation organized and existing under the laws of the State of Michigan which, upon information and belief, maintains its corporate headquarters and principal place of business at 1000 Belt Line Street, Cleveland, Ohio 44109.  Detrex Corporation may be served with process by service upon its registered agent, CSC – Lawyers Incorporating Service, 3410 Belle Chase Way, Ste 600, Lansing, Michigan 48911.  Detrex Corporation is not registered to do business in the State of Mississippi and, upon information and belief, does not do any business within the State of Mississippi.

14.     John Doe Corporations 1-5 are those certain corporations who owned, retained, or acquired any of the liabilities arising out of or related to operation of the Facility located on the subject premises through purchase, sale, transfer, conveyance, or distribution to or from Coltec Industries, Inc., Goodrich Corporation, Old Co, LLC, Enpro Industries, or Enpro Holdings.

## **JURISDICTION AND VENUE**

15.     This Court has jurisdiction over this civil action pursuant to 28 U.S.C. §1332.  All Plaintiffs are residents of Yalobusha County, Mississippi who were injured and damaged by exposure to trichloroethylene and/or other volatile organic compounds due to or as a result of Defendants' intentional, negligent, reckless, wanton, and/or grossly negligent use and discharge of Trichloroethylene at or near the premises located at 600 Highway 32 East, Water Valley, Yalobusha County, Mississippi.  None of the Defendants maintain their principal place of business in Mississippi and are non-residents of Mississippi. The amount in controversy of each individual Plaintiff, as well as all Plaintiffs collectively, exceeds $75,000.00.

16. Venue is appropriate in the Oxford Division of the United States District Court for the Northern District of Mississippi because all of the actions of Defendants occurred in whole in or in part in Yalobusha County, Mississippi.

**FACTS**

17. On or about November 1972, the Holley Automotive Division of Colt Industries, Inc., which was subsequently renamed Coltec Industries, Inc. in 1990, (hereinafter "Coltec") acquired the former Ram Tool manufacturing facility located at 600 Highway 32 East in Water Valley, Mississippi (hereinafter "the Facility") and began manufacturing automotive parts, including, but not limited to, automobile carburetors and related components.

*History of Coltec's TCE Usage at the Facility*

18. Shortly after acquiring the Facility, Coltec purchased and installed a vapor degreaser manufactured by Detrex Chemical Industries, Inc. ("**Detrex**") to remove the oils, grease, dirt, metal shavings, and other debris and/or contaminants which had accumulated on the automotive parts during the fabrication process.

19. The Detrex degreaser purchased by Coltec used the chemical trichloroethylene, or TCE, to clean the automotive parts. TCE, a clear, colorless, and non-flammable liquid with a sweet taste and smell, is a volatile organic compound, or "VOC," which is well known as both a degreasing solvent and human carcinogen. TCE is classified as a dense nonaqueous phase liquid, meaning it is heavier than water and, if discharged into the environment, will tend to sink down into the ground and contaminate the water table. TCE can remain volatile in the soil for decades and has the potential to degrade into other carcinogens, such as vinyl chloride.

20. To clean the automotive parts with the Detrex degreaser, an employee would place them into a wire-basket, lower the wire-basket into the degreasing unit, close the lid on the degreasing unit, and start the machine. The Detrex degreaser would then bathe the parts in TCE liquid and vapor until fully cleaned. Once the cleaning process was complete, the employee would lift the basket out of the degreaser,

visually inspect the parts to make sure they were clean, and then send them to another area of the Facility for final inspection, packaging, and shipping.

21.     The Detrex degreaser was a large unit that required a substantial amount of TCE to operate. To ensure the degreaser had a steady supply of TCE, Coltec purchased and installed a 4,000 gallon above-ground storage tank to hold unused, or "virgin," TCE. That tank was installed outside of the facility and connected directly to the degreaser via an underground pipe.

22.     As the Detrex degreaser cleaned the automotive parts with virgin TCE from the 4,000 gallon storage tank, it produced two forms of TCE waste, one which was liquid in nature and the other which consisted of a semi-solid sludge (referred to in the industry as "still bottoms"). Thus, Coltec also purchased and installed a 1,000 gallon above-ground storage tank to hold the liquid TCE waste. That tank was also installed outside, was connected directly to the degreaser via an underground pipe, and was primarily used either to store the liquid TCE waste or store the TCE that was in the degreaser while the unit itself was being cleaned or undergoing periodic maintenance.

23.     While the liquid TCE waste could be drained into the 1,000 gallon storage tank, the TCE sludge which accumulated inside the bottom of the degreaser was more difficult to remove. In order to clean the TCE sludge from the degreaser, Coltec directed its employees to first drain as much of the sludge as they could into a fifty-five (55) gallon drum and then manually scoop out the rest. Though Coltec knew or should have known that employees needed to wear personal protective equipment over their skin, eyes, nose, and mouth while cleaning the TCE sludge from the bottom of the degreaser, it did not inform, instruct, or require its employees to wear any of the personal protective equipment identified in the Detrex degreaser manual.

24.     That Coltec was not concerned with disposing of its TCE waste responsibly is evident from the fact that it did not have any sort of plan or procedure in place for the responsible disposal of its TCE waste. Instead, Coltec decided it would use Mississippi as its "dumping ground for hazardous waste" and save the expense of hiring a licensed chemical disposal company to dispose of its TCE waste.

8

25.     Echoing that sentiment, Coltec, on at least one occasion, instructed employees to open the bottom valve on the 1,000 gallon tank and drain all of the TCE waste into a ditch behind the Facility. The very next day after that intentional discharge, a Coltec employee noticed approximately twenty (20) dead turtles in the ditch and reported it to his manager and several other co-workers.

26.     Coltec was unfazed by the turtles' deaths and more focused on the problem at hand – getting rid of its TCE waste any way it could without incurring the expenses associated with proper disposal. On numerous occasions, Coltec accomplished its goal by allowing the 1,000 gallon tank to become so full with TCE waste that it would overflow from the tank's top vent and pour down onto the ground.

27.     Instead of increasing the size of its waste tank or actually hiring a licensed company to dispose of its TCE waste, Coltec found new and more creative ways to get rid of it. As a result of its prior discharges of TCE waste, Coltec knew the waste would kill weeds and other vegetation on contact. In an effort to kill two birds (or turtles) with one stone, Coltec had its employees start spraying the TCE waste in the gravel parking lot and around the buildings at the Facility to control weeds and knock down the gravel dust. Coltec also told employees they could take home as much TCE waste as they wanted to kill the weeds in their own yards. Coltec even gave large quantities of TCE waste to the Yalobusha County Road Department to spray on the county roads and rights-of-way.

28.     In addition to its discharge of TCE and TCE waste into the Yalobusha County environment, Coltec also experienced several "spills" of TCE and TCE waste. After one such "spill" occurred, the owner of a neighboring property approached Coltec management and informed them that her cattle were getting sick after drinking water a ditch on Coltec's property. Additional spills were documented by TIWC Environmental Services, Inc. ("**TIWC**"), an environmental contractor hired by Coltec, which found multiple "spill(s) of pure phase TCE" after 1976 which "contaminated" the "soil" and "groundwater." TIWC further confirmed that Coltec discharged TCE into the environment on numerous occasions when the 1,000 gallon waste tank would overflow from the top vent and documented a loose fitting on the 4,000 gallon tank which actively leaked TCE into the environment for long periods of time.

9

29. Despite some knowledge of the dangers that TCE and TCE waste posed to plant, aquatic, and animal life, Coltec was apparently satisfied with its methods for disposing of its TCE waste and, in 1981, ramped up its TCE usage when it bought a new Detrex degreaser to replace the old one and purchased several smaller ultrasonic vapor degreasers which it installed throughout the Facility. Though Coltec purchased, installed, and used more degreasers at that time, it did not take any measures to increase its capacity for storing or disposing of TCE waste and, until approximately 1983, did not retain a licensed chemical disposal company to handle the TCE waste for them.

30. On or about January of 1987, Coltec finally quit using TCE as a degreaser/solvent at the Facility. From 1972 to 1987, Coltec records demonstrate it purchased at least 80,000 gallons of TCE. Those same records also demonstrate that Coltec only responsibly disposed of approximately 5,775 gallons, or seven percent (7%), of all waste TCE it generated.

### *Investigation of TCE Contamination Emanating from the Facility*

31. Because TCE is a known carcinogen, the United States Environmental Protection Agency ("**USEPA**") deems groundwater to be contaminated when the concentration of TCE therein exceeds 5 parts per billion ("ppb"). The value of 5 ppb is referred to as the maximum contaminant level ("MCL") for TCE. The USEPA deems indoor air to be contaminated when the TCE concentration exceeds 26 $\mu g/m^3$.

32. In 1988, Coltec tested the municipal well which supplied water to the Facility and learned that it contained concentrations of TCE above the maximum contaminant level of 5ppb. Shortly thereafter, Coltec administration began "designing an action plan" which included disclosing the contamination to the Mississippi Department of Environmental Quality ("**MDEQ**"), "initiat[ing] drinking water construction" by hiring a plumber to connect the Facility to the City of Water Valley water supply so that employees would have clean drinking water, prepare "an official Company position regarding the water supply, and to communicate to its employees "that we are connecting into the Water Valley city water system."

33. Upon information and belief, Coltec did not issue a press release that informed the public about its contamination of the municipal well with TCE and only told its employees that the Facility was being connected to the City of Water Valley water supply, that they should not use or drink water from the

water fountain or sinks, and that they would be provided bottled water to use and drink until the new water line was connected.

34. Coltec disclosed the TCE contamination to the MDEQ which then conducted further testing and discovered that, not only was the municipal well supplying water to the Facility contaminated, but another domestic well used by a nearby property owner also contained concentrations of TCE above the maximum contaminant level. To determine whether Coltec had contaminated a "significant aquifer utilized in the site area to provide potable water for municipal, domestic, and industrial purposes," the MDEQ ordered Coltec to, *inter alia*, develop and implement plans to identify the extent of TCE contamination in the area surrounding the facility and remove it from the environment.

35. At MDEQ's direction, Coltec began collecting and testing soil and groundwater samples from property located at or near the Facility which, upon information and belief, contained concentrations of TCE as high as 1,500,000 ppb. It then retained a third-party engineering firm to collect additional samples from borings and monitoring wells to identify the boundaries of the TCE plume and develop a remediation plan.

36. Upon information and belief, the additional sampling revealed that the plume of TCE emanating from the Facility covers approximately 340 acres, measures 3,900 feet long by 2,100 feet wide, and extends from the Facility in a northerly direction toward the Otoucalofa Creek and downtown business district of Water Valley. The following graphical representation depicts the size of the TCE plume and was submitted by Enpro Industries to the MDEQ:

11



37. To remediate the TCE contamination, Coltec proposed using a process known as "thermal desorption," which required it to place four pumps along the northern boundary of the TCE plume which would push air through the underground substrate and aquifer towards a pump situated near the Facility. The pump situated near the facility would then draw the air up and through a thermal desorption unit which inactivated the TCE and discharged the inert by-products into the atmosphere.

38. Under the 1990 MDEQ Order, Coltec was required to collect and test samples from monitoring wells located in or near the plume on a monthly basis from 2006 to 2015. However, from June

12

2008 through June 2013, Enpro Industries[2] did not conduct any of the required sampling and testing required by the MDEQ order. Instead, for approximately six (6) years, Enpro Industries sent a letter to the MDEQ each month wherein it represented that there was "no discharge during the period" because of "equipment malfunctions" or because the system was "down for maintenance."

39. Enpro Industries started sending the test results from each month sampling of the results the During each round of testing, approximately seventeen (17) monitoring wells contained concentrations of TCE well above the maximum contaminant level of 5 ppb, with several containing concentrations of TCE ranging from 1,000 ppb to 4,300 ppb.

40. Coltec's irresponsible and negligent discharge of TCE into the surrounding environment not only contaminated the ground and underlying water table, it also contaminated the air inside the facility. Through a process known as vapor intrusion, TCE present in the ground underneath the Facility vaporized and infiltrated the indoor environment through cracks in the Facility's foundation. When the air inside the Facility was initially tested, it was found to have concentrations of TCE vapor ranging from 4.65 ug/m3 to 2,820,000 ug/m3, well in excess of the generally accepted indoor air concentration of 1 ug/m3.

---

[2] Based on documents submitted by Enpro to the Securities and Exchange Commission and the Mississippi Department of Environmental Quality, it began managing the liabilities at the Facility site as early as 1996 or as late as 2002.



*Plaintiffs' Mechanism of Exposure to TCE*

41.     TCE is a toxic chemical long known in Mississippi to be so dangerous that it was not considered safe to be used in *cattle feed* back in the 1950s due to concerns that the cattle developed hemorrhagic diseases and disorders that caused them to bleed out and die from awful and shocking deaths. *See*, generally, *Nishida v. E.I. Du Pont De Nemours & Co.*, 245 F.2d 768 (5th Circ. 1957); *E.I. Du Pont De Nemours & Co.*, 221 Miss. 378, 73 So.2d 249 (1954)(chief cases amongst a widespread phenomenon of litigation in Mississippi involving horrible cattle deaths from TCE infected feed).

42.     Humans may be exposed to TCE through ingestion, inhalation, and dermal contact. Thus, an individual can be exposed by breathing TCE vapors that are emitted into the air, by physical contact with TCE on their skin, by drinking groundwater contaminated with TCE, or by eating/drinking food and drinks which have been exposed to TCE vapors in the air.

43.     TCE is highly volatile and will evaporate into the air at room temperature.  Thus, introduction of TCE vapors into room air is as easy as leaving it in an opened container in a room.

44.     Plaintiffs are former employees of the Holley Automotive Division of Colt Industries, Inc., Colt Industries, Inc., Coltec Industries, Inc., Enpro Holdings, Enpro Industries, and/or BorgWarner Inc. who were exposed to raw TCE, drinking water contaminated with TCE, and/or indoor air contaminated with

14

TCE, and continued to be exposed to TCE through the groundwater, air, and vapor intrusion from the soil of the toxic plume that the Defendants released upon the local community.

45.    TCE is a chlorinated solvent and a toxic chemical that is not found in nature.[3] The chemical product was originally developed as an anesthetic that caused humans to lose consciousness or become insensitive to pain. TCE was used for a long time in common household cleaning products, tool degreasers, paint removers, and aerosol products for years in the United States.  However, it was banned for use in humans by the Food and Drug Administration as early as 1977.  It can be found in the air, water, and soil at any places where it is produced or used, as it breaks down slowly and remains in the environment for long periods of time, and readily passes through soil and groundwater.  Anyone exposed to TCE may absorb it through their skin, through the air, through drinking water, or by eating foods grown or otherwise in contact with TCE.

46.    Humans can become exposed to TCE through a variety of methods, the most common of which is inhalation, skin absorption, ingestion, skin contact, or eye contact.[4]  Excessive contact with TCE can cause irritation, headaches, visual disturbances, weakness, dizziness, tremors, drowsiness, nausea, vomiting, rashes, cardiac arrhythmias, paresthesia, and liver injuries.  It is known to target and damage a wide variety of organs in the human body, most specifically the eyes, skin, respiratory system, heart, liver, kidneys, and the central nervous system in general.

47.    TCE is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans".[5]  This conclusion is "based on epidemiological studies showing that it causes

---

[3] See, generally, "Trichloroethylene," *Cancer Causing Substances*, National Cancer Institute, located online as of filing at: https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/trichloroethylene#:~:text=Which%20cancers%20are%20associated%20with,and%2C%20possibly%2C%20liver%20cancer.

[4] National Institute of Occupational Safety and Health. Trichloroethylene, NIOSH Pocket Guide to Chemical Hazards. Atlanta, GA: Centers for Disease Control and Prevention, 2010. Located online as of filing at: https://www.cdc.gov/niosh/npg/npgd0629.html

[5] National Toxicology Program. 2021. Trichloroethylene, Report on Carcinogens, Fifteenth Edition.; Research Triangle Park, NC: U.S. Department of Health and Human Services, Public Health Service.

kidney cancer in humans, together with supporting evidence from toxicological, toxicokinetic, and mechanistic studies demonstrating the biological plausibility of its carcinogenicity in humans."

In addition to cancers, TCE exposure is linked to the development of numerous other health related issues.[6] The U.S. Environmental Protection Agency identifies the most dangerous and hazardous toxic waste sites throughout the country, and has identified TCE in at least 1,051 of the 1,854 current of former sites subject to regulation under the National Priorities List.

46.     In the largest study of TCE exposure to date, U.S. government has found TCE exposure to be linked to a wide range of physical ailments.[7] The long list of ailments associated with TCE exposure includes:

- Kidney cancer
- Non-Hodgkin lymphoma
- Cardiac defects
- leukemia
- multiple myeloma
- end-stage renal disease
- Parkinson's disease
- Scleroderma
- chonal atresia
- eye defects
- low birth weight
- fetal death
- major malformations
- miscarriage
- neural tube defects
- oral cleft defects including cleft lip
- small for gestational age
- breast cancer
- cervical cancer
- esophageal cancer
- lung cancer
- Hodgkins disease
- ovarian cancer
- prostate cancer
- rectal cancer

---

[6] Agency for Toxic Substances and Disease Registry (ATSDR). Toxicological Profile for Trichloroethylene (Update). U.S. Public Health Service, U.S. Department of Health and Human Services, Atlanta, GA. 2014. Located online as of filing at: https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=173&tid=30

[7] Agency for Toxic Substances and Disease Registry (ATSDR). ATSDR Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases U.S. Public Health Service, U.S. Department of Health and Human Services, Atlanta, GA. 2017. Located online as of filing at : https://www.atsdr.cdc.gov/sites/lejeune/tce_pce.html

- impaired immune system function
- neurological effects (delayed reaction times, problems with short-term memory, visual perception, attentions, and color vision)
- neurobehavioral performance deficits (i.e., delayed recall and deficits in visual perception), decreased blink reflex, and mood effects (i.e., confusion, depression, and tension)
- severe, generalized hypersensitivity skin disorder (an autoimmune-related disease)

This list is by no manner exhaustive, as scientific study into the toxic effects of TCE continues to evolve every day. All of the Plaintiff(s) attached to this suit suffer from health and/or emotional distress issues stemming directly from the prolonged and continuous poisoning of the air, water, soil, and people within the communities of Water Valley, Mississippi, and the greater Yalobusha County area impacted by the plume created by the conduct of the Defendants.

47.     Perhaps what is most terrifying about the dangers of TCE exposure is that it the long-term or routine exposure to it which can lead to the latent appearance of health issues *decades* after the initial exposure to the chemical, in a similar fashion to how long-term exposure to asbestos can lead to hidden health issues that appear years down the line, including various types of cancers along with a wide range of autoimmune related issues.[8]

48.     In terms of overall population, Yalobusha County is one of the least populated counties throughout the State of Mississippi. It checks in as the 62nd most populated counties in a state that has a total of 82 counties. Only just over 12,000 people reside within the entire county.[9]

49.     Despite the relatively small population, Yalobusha County's history of being polluted and poisoned with TCE by the Defendants have led to it being designated as having, by *far*, the highest rate of

---

[8] See, generally: Cooper, G.S., Makris, S.L., Nieter, P.J., Jinot, J. *Evidence of autoimmune-related effects of trichloroethylene exposure from studies in mice and humans*. Environ. Health Perspect., 117 (2009), pp. 696-702; Parks, C.G., De Roos, A.J. *Pesticides, chemical industrial exposures in relation to systemic lupus erythematosus*. Lupus, 23 (2014), pp. 527-536; Abbot, S., Bossingham, D., Proudman, S., de Costa, C., Ho-Huynh, A. *Risk factors for the development of systemic sclerosis: a systemic review of the literature*. Rheumatol Adv. Pract., 2 (2018), p. ryk041; Hosgood 3rd, H.D., Zhang, L., Tang, X., Vermeulen, R., Qui, C., Shen, M., Smith, M.T., Ge, Y., Ji, Z., Xiong, J., He, B., Reiss, S., Liu, Y., Xie, Y., Guo, W., Galvan, L., Li, L., Hao, Z., Rothman, N., Huang, H., Lan, Q. *Decreased numbers of CD4(+) naïve and effector memory T cells, and CD8+) Naïve T cells, are associated with trichloroethylene exposure*. Front. Oncol., 1 (2011), p. 53; Iavicoli, I., Marinaccio, A., Carelli, G. *Effects of occupational trichloroethylene exposure on cytokine levels in workers*. J. Occup. Envriron. Med., 47 (2005), pp. 453-457.

[9] See Mississippi Demographic information, located as of filing of this Complaint at: https://www.mississippi-demographics.com/counties_by_population

17

growth in the new diagnosis of *all cancers* of any county in the State of Mississippi. This information has been compiled and confirmed by the National Institute of Health's National Cancer Institute's State Cancer Profiles.[10] The rapidly increasing "Cancer Cluster" in Yalobusha County is so drastic that despite its tiny population size, it presently ranks 22nd in diagnoses of all cancer types out of the 3,143 counties that make up the United States of America.[11]

50.     The Plaintiffs allege that the presence of this "Cancer Cluster" and the massively increasing rates of all cancer types throughout the local population is a direct result and the responsibility of the Defendants to this litigation. The conduct and the consequences of the actions of the Defendants constitutes a wrong that justice demands be rectified.

### *The Impact of the TCE Plume upon the Town of Water Valley*

51.     The town of Water Valley has, and continues to be, heavily impacted by the flow of the TCE plume through the groundwater, soil, and air near the plume emanating from the Facility at issue. Documentation within the MDEQ file relating to the plume stemming from the Facility have noted that over the decades the full extent and spread of the plume is unknown. The map referenced within these pleadings only shows the known spread of plume, and the operators of the Facility have repeatedly been warned of this fact through various descriptive quotes on the plumes true nature: that the maps represent the plume's "suspected perimeter"; that "further data is required to detect and verify the true extent of the plume"; that the true "extent of the environmental harm has not been determined." In short, knowledge about the true nature, extent, and levels of the northward flow of the pollution is currently limited to the places where the operators of the Facility were forced to look.

52.     At the same time, documentation within the MDEQ file has repeatedly warned the operators of the Facility that the flow of the plume emanating from the Facility flows northward towards

---

[10] See NIH website data, located online as of filing at:
https://statecancerprofiles.cancer.gov/incidencerates/index.php?stateFIPS=28&areatype=county&cancer=001&race=00&sex=0&age=001&type=incd&sortVariableName=recentaapc&sortOrder=desc#results
[11] See NIH website data, located online as of filing at:
https://statecancerprofiles.cancer.gov/incidencerates/index.php?stateFIPS=00&areatype=county&cancer=001&race=00&sex=0&age=001&type=incd&sortVariableName=recentaapc&sortOrder=desc#results

the downtown area of Water Valley. For decades, Enpro has been warned that the plume: "has the potential to contaminate downgradient flow of water into the downtown area for decades to come"; and that the plume "is going to move north towards the downtown area." Much of this information has been known since at least the late 1980s. Despite being informed that the plume would continue to migrate, Enpro has made no effort to conduct subsequent exploratory testing outside the alleged plume since delineating its boundaries in 2016.

53.     Presently, the known extent of the plume lies only 4,000 feet from downtown Water Valley, a city with a combined population of just over 3,380 individuals. The Facility from which the plume emanates is just over 7,000 feet from downtown Water Valley. At no time has Enpro Industries or Enpro Holdings ever undertaken any water, soil, or vapor intrusion testing to officially determine if the TCE plume has continued to flow northward into the Water Valley downtown area, despite repeated warnings that the plume has been anticipated to flow in that direction for decades without proper remediation.

54.     The small nature of this town is such that the impact of the plume has an outsized impact on the life, health, and quality of the lives of those people living within Water Valley over the last forty to fifty years. The following local businesses and important community locations are all either known to be directly inside the currently known extent of the TCE plume, or are within the immediate range and northward expected flow path of the TCE plume: the only local hospital; the largest retirement community for the elderly; all of the local family care practice doctors; the local sheriff's department; nearly every local government building or office; dozens of stores, restaurants, and local businesses; the courthouse; the local health clinic; social services offices; the area's largest local event and wedding center; all local insurance businesses and banks; several of the largest local religious institutions; a soccer field for youth groups; the only local community sports facility containing tennis courts and youth baseball fields; the town library; all mental health services and facilities; grocery stores; book stores; all physical therapy businesses; the local museum; and all of the local public and private schools for the youth of the community.

55.     Almost every single major public or private business, political, judicial, educational, social, religious, or health facility in Water Valley is either directly known to be impacted by the TCE plume as

defined by Enpro in 2016, or is otherwise known to be directly on the immediate northern edge and in the direct flow path of the presently known extent of the TCE plume. As recently as 2016, some of the monitoring wells within the TCE plume showed testing levels more than 2,400% higher than the known safety levels for TCE exposure to humans. Other testing of wells have shown testing levels more than 300,000% higher than known safety levels for human exposure.

56.     Upon information and belief, a large amount of people living within the Water Valley community over the past several decades have been subject to a massive amount of continuous TCE exposure during their every day activities through contact with TCE laden water, soil, and vapor at or near the plume. Additionally, anyone seeking medical care, visiting retired relatives, attending church, going to school, owning property, or simply going out to eat has more likely than not been subjected to large amounts of TCE exposure.

57.     The fact of the overwhelmingly large amount of the pollution in this relatively small area only underscores the nature of the public health dangers at issue. By way of comparison, MDEQ documentation establishes that a single cup of TCE in a two-acre, six-foot-deep pond would be enough to exceed the acceptable exposure levels for humans. For ease of comparison and by way of extrapolation, that would be roughly equivalent to a one-ounce shot glass being poured into a large, Olympic-sized pool. Based upon the records and documentation the Facility operators provided to MDEQ, through the course of the use of TCE at the Facility, roughly 7,125,600 one ounce shot glasses of TCE were polluted into the area surrounding the Facility and flowing north towards Water Valley.

58.      Of the Plaintiffs in this lawsuit, three have spent years of their lives belonging to the Water Valley local community and still continue to live there to this day. Plaintiffs Eddie Foster, Joan Beryhill, and Patricia Camp all have lived and continue to live within the downtown Water Valley area.  Moreover, Plaintiff Eddie Foster owns a neighboring parcel of real property that lies directly south of the Facility and which shares a boundary line with the Facility's parcel.  Additionally, Enpro gave Excell Vance, as well as other employees not presently named in this suit, drums of spent TCE to spray on weeds at his house and to use as a degreaser for tractors and other equipment.  All of these Plaintiffs have been and continue to be

exposed to TCE pollution in their everyday lives and on their own property, with some residing within a few thousand feet of the immediate area of the 2016 northern boundary of the TCE plume.

59.     For these Plaintiffs, and other residents of Water Valley, everyday activities have and continue to involve constant exposure to the dangers of TCE, long after they stopped working at the Facility. For each of these Plaintiffs, trips to the doctor, houses of worship, children and grandchildren's school events, youth sporting events, visits to friends at retirement homes, and simple trips to the grocery store or local restaurants involve the continued and routine exposure to the toxic pollution of TCE that afflicts the local area.

61.     For the Plaintiffs living within the Water Valley community, nearly every day of their lives has been and continues to be plagued by the constant and continuous presence of dangerously high levels of TCE pollution emanating from the Facility's plume, which will continue to flow northward for decades to come despite Enpro's alleged efforts at remediation. This constitutes a significant and unreasonable interference with public rights for those within the area of the toxic pollution. The past, present, and future conditions in Water Valley constitute a significant interference with public health, public safety, comfort, and convenience. Furthermore, the operators of the Facility have known for decades of the continuing nature of the harm and high likelihood that the dangers imposed upon the local community are of a long-lasting and/or permanent nature.

62.     The invisible nature of this harm in no way lessens the impact upon local health and the exercise of public rights, as the local population of Water Valley cannot go to hospitals, public offices, health care facilities, schools, or children's sporting events without being exposed to potentially lethal levels of TCE in the groundwater, soil, and vapor intrusion into buildings close to or within the area of the plume.

63.     Plaintiffs Eddie Foster and Patricia Camp in addition own real estate in the downtown area of Water Valley. Besides simply living there under the daily threat of exposure, they are likely to suffer additional harms by virtue of this property ownership. The operators of the Facility have intentionally refused to perform any additional testing as to the true extent of the TCE plume, with full knowledge that it is expected that the plume has and will continue to flow northward into the downtown area of Water

21

Valley. Upon information and belief, TCE has already invaded upon and contaminated their real estate. The dangerous presence and extent of the TCE plume and its effect upon the above-discussed facilities, public buildings, businesses, and social meeting places can only result in massive financial harm, if only through stigma damages, upon their ability to resell property that is so closely located to the TCE plume and the local "Cancer Cluster" that exists in Water Valley.

**CAUSES OF ACTION**

**Count 1: Private Nuisance**

64.     Entirely separate from the fact that they were employees of the Enpro entities (including the various predecessor or successor operators of the Facility), Plaintiffs Eddie Foster, Joan Beryhill, Patricia Camp, and Excell Vance all have claims for public and/or private nuisance against Defendants Enpro Holdings and Enpro Industries

65.     Nuisance principles form the core doctrinal foundation for modern environmental statutes, and its common law principles are particularly suitable for dealing with environmental pollution that may impact the lives or property of people impacted by such pollution. *See, generally, Cox v. City of Dallas, Tex.,* 256 F.3d 281, 289-90. Private and public nuisances are "not set apart in rigid, mutually exclusive categories." *Id*. When the nuisance, "in addition to interfering with the public right, also interferes with the use and enjoyment of the plaintiff's land, it is a private nuisance as well as a public one." *Id.* (citing Restatement (Second) of Torts § 821C cmt. e) Mississippi in particular relies upon the application of such principles in addressing pollution. *See, additionally, Shutes v. Platte Chemical Co.*, 564 So.2d 1382, 1384 (Miss. 1990)(finding liability and punitive damages appropriate in a case where a chemical company allowed dangerous chemicals to leak onto another property); *American Potash & Chemical Corp. v. Nevins*, 249 Miss. 450, 463, 163 So.2d 224, 230 (1964)(using a nuisance analysis for chemical contamination of another property); *U.S. Fidelity and Guar. Co. v. B & B Oil Well Service, Inc.*, 910 F.Supp. 1172, 1184 (S.D. Miss. 1995)(applying nuisance and trespass in a pollution context).

66.     The actions of Defendants Enpro Holdings and Enpro Industries (and the predecessor and successor operators of the Facility that they have accepted liability for) in polluting and creating the TCE

22

plume discussed above constitute both a private and public nuisance that has subjected the Plaintiffs and other members of the local Water Valley community to continued and repeated exposure to dangerously high levels of TCE as part of their everyday lives.

67. The actions of the Defendants in polluting and creating the TCE plume discussed above constitute a private nuisance in any situation where private property, such as that belonging to Plaintiffs Eddie Foster and Patricia Camp, may be or is contaminated simply by existing upon the northern edge of the TCE plume, especially when the Enpro Defendants know the TCE will continue to flow northwards towards the downtown area of Water Valley. Presently, the current and full extent of the TCE pollution and its spread along the northern edge of the TCE plume heading into Water Valley is unknown, as the operators of the Facility have refused to conduct further recommended testing or installation of wells within the area. However, upon information and belief, including the decades of information contained within MDEQ files warning the Enpro Defendants of the expected northward flow of the TCE plume, the properties belonging to Plaintiff's Eddie Foster and Patricia Camp have been contaminated with TCE. Furthermore, it is more likely than not that many of the properties located within the downtown area of Water Valley have already been, or will soon be, contaminated with dangerously high concentrations of TCE.

68. The actions of the Defendants Enpro Holdings and Enpro Industries in exposing these Plaintiffs and others within the Water Valley community to repeatedly dangerous levels of TCE constitutes a threat to public health. Nearly every day of their lives has been and continues to be plagued by the constant and continuous presence of dangerously high levels of TCE pollution emanating from the Facility's plume, which will continue to flow northward for decades to come. This constitutes a significant and unreasonable interference with public rights for those within the area of the toxic pollution. The past, present, and future conditions in Water Valley constitute a significant interference with public health, public safety, comfort, and convenience. Furthermore, the operators of the Facility have known for decades of the continuing nature of the harm and the high likelihood that the dangers imposed upon the local community are of a long-lasting and/or permanent nature.

69. Defendants Enpro Holdings and Enpro Industries are directly responsible for causing these Plaintiffs to suffer repeated exposure to TCE. Such conduct constitutes an invasion of their public and/or private interests that is intentional and unreasonable, or is unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

70. As a result of the repeated exposure, these Plaintiffs have suffered damages beyond that of personal injuries, in the form of nuisance, annoyance, fear, emotional harms, and financial damages to the extent that TCE has invaded upon their personal real estate, in the form of reduced sale value, remediation of the property, or impairments to the transfer of any interests in the property due to stigma damages from its close connection with the toxic TCE plume emanating from the Facility.

### Count 2: Public Nuisance

71. Plaintiffs Eddie Foster, Joan Beryhill, Patricia Camp, and Excell Vance incorporate by reference and restate the same allegations contained within Count 1 regarding private nuisance.

72. The same Plaintiffs allege that Enpro Holdings and Enpro Industries are liable for the same reasons under the doctrine of public nuisance, to the extent such claims may differ.

73. Defendants Enpro Holdings and Enpro Industries are directly responsible for causing these Plaintiffs to suffer repeated exposure to TCE. Such conduct constitutes a legal invasion of their public interests that is intentional and unreasonable, or is unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

74. Irrespective of these Defendants' negligence, intent, or fault, they are responsible for the creation and continuing presence of a dangerous and deadly condition that has and continues to impact the daily life, health, and safety of the community of Water Valley.

75. As a result of the repeated exposure, these Plaintiffs have suffered damages beyond that of personal injuries, in the form of nuisance, annoyance, fear, emotional harms, and financial damages to the extent that TCE has invaded upon their personal real estate, in the form of reduced sale value, remediation

of the property, or impairments to the transfer of any interests in the property due to stigma damages from its close connection with the toxic TCE plume emanating from the Facility.

**Count 3: Intentional Infliction of Emotional Distress**

76.     Plaintiffs Eddie Foster, Joan Beryhill, Patricia Camp, and Excell Vance have claims against Defendants Enpro Holdings and Enpro Industries for intentional infliction of emotional distress.

77.     Courts within the State of Mississippi recognize claims for intentional infliction of emotional distress in cases where the Plaintiff(s) can prove that the emotional distress was a reasonably foreseeable result of the Defendants' conduct, such as in situations where the Defendants' conduct was malicious, intentional, or outrageous. *Morgan v. Greenwaldt*, 786 So.2d 1037, 1044 (Miss. 2001); *Smith v. Malouf*, 722 So.2d 490, 497 (Miss. 1998).

78.     The conduct of the Defendants' in intentionally and knowingly exposing these Plaintiff(s), the local populace, and the soil, air, and groundwater – basically the entire environment - of the affected community to sustained and continuous exposure to TCE constitutes conduct that is anathema to anything remotely close to considered, reasonable, or civilized conduct.  The Enpro Defendants have known for decades that the TCE plume has not been properly remediated and have knowingly refused to comply with decades of warnings that the TCE plume has and will continue to flow northward towards the downtown area of Water Valley. Throughout this time, the Enpro Defendants have known that the true nature and extent of the northward flow of TCE has not been fully understood in scope or expanse, and have had knowledge of the dangerous potential for the TCE plume to effect and impact the residents and citizens of the Water Valley community.

79.     The Defendants' actions in intentionally allowing the poisoning the residents, lands, and surrounding environment over the course of nearly half a century is the definition of outrageous, malicious, and intentional conduct.

80.     As a result of the conduct of the Defendants, the Plaintiff(s) have suffered physical and emotional damages, stress, fear, and harms beyond personal injury damages that continue to the present day, and continue to get worse.

**Count 4: Fraudulent Concealment**

81.     Throughout the last half-century, the Defendants Enpro Holdings and Enpro Industries have engaged in a pernicious, cruel, and shocking attempt to hide and/or conceal the damage that TCE pollution and exposure has caused to the Plaintiff(s), the people of the surrounding community, and the environment throughout the land impacted by its pollution.

82.     Even *decades* after being fully aware of the harmful effects of TCE exposure and its profoundly polluting effects upon the local population, lifestock, soil, and groundwater, the Defendants have continued to overly and intentionally lie to the people, local government, and agents of the State of Mississippi about its continued refusal take responsibility for its actions and their wide-reaching effects upon the people and land that surround the plume.

83.     The State of Mississippi recognizes the doctrine of fraudulent concealment, which requires a showing of acts or conduct that constitute and affirmative nature designed to prevent, and which does prevent, discovery of potential legal claims. *Stephens v. Equitable Life Assurance Soc'y*, 850 So.2d 78, 83-84 (Miss. 2003)(quoting *Reich v. Jesco, Inc.*, 526 So.2d 550, 552 (Miss. 1988)).

84.     To toll the statute of limitations, the Plaintiff(s) must prove that the Defendants engaged in affirmative acts of concealment, and that despite investigating with due diligence, the Plaintiff(s) were unable to discover their claims. *Nygaard v. Getty Oil Co.*, 918 So.2d 1237, 1242 (Miss. 2005).

85.     The facts alleged within this pleading set forth with detail the heinous and intentional nature of the Defendants' continued attempts to fraudulently and intentionally lie and conceal the horrors of what it has continued to do by exposing and polluting the local populace and environment with TCE which continues until the present day.

86.     Accordingly, any delay in filing by the Plaintiff(s) is excused and protected under the doctrine of fraudulent concealment.

**Count 5: Equitable Estoppel**

87.     The State of Mississippi recognizes the doctrine of equitable estoppel, which requires a representation by a party, reliance by another, and a change in position by the relying party. *Carr v. Town*

26

*of Shubata*, 733 So.2d 261, 265 (Miss. 1999)(quoting *Westbrook v. City of Jackson*, 665 So.2d 833, 839 (Miss. 1995)).

88.    The conduct of Defendants Enpro Holding and Enpro Industries in continuing to lie and misrepresent the extent of its pollution and exposure of TCE to the local populace and environment surrounding the plume constitutes evidence of an intend by the Defendants to mislead everyone from the extent of the harms and damage continuing to occur to the community.

89.    The misrepresentations and outright lies by the Defendants have caused the Plaintiff(s) to be induced not to file or realize the extent of their legal claims.

90.    This conduct by the Defendants resulting in any legal claims belonging to the Plaintiff(s) to potentially be barred by applicable statutes of limitations, and the Defendants knew or had reason to know that such consequences would follow from the actions of the Defendants. *Harrison Enters. v. Trilogy Commc'ns, Inc.*, 818 So.2d 1088, 1095 (Miss. 2002)(citing *PMZ Oil. Co. v. Lucroy*, 449 So.2d 201, 206 Miss. 1984)).

91.    To the extent that any potential statutes of limitations my apply to bar legal claims by the Plaintiff(s), the inequitable and/or fraudulent conduct of the Defendants operates to allow the doctrine of equitable estoppel to bar any affirmative defenses based upon any statute of limitations. *Miss. Dep't of Public Safety v. Stringer*, 748 So.2d 662, 665 (Miss. 1999).

**Count 6: Continuing Tort Doctrine**

92.    The actions of the Defendants constitute a continuing tort, as the Plaintiff(s), community, and local populace surrounding the plume continue to be exposed to TCE in the air, soil, and groundwater surrounding the plume to this very day, as TCE continues to pollute the area.

93.    The State of Mississippi recognizes the doctrine of continuing tort.

94.    Where a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run, from the date of the last injury, or when the tortious acts cease. A continuing tort is one that is inflicted over a long period of time, and involves wrongful conduct that is repeated until desisted, with each day creating a separate cause of action. Continual unlawful acts by Defendants are

27

sufficient to avoid any potential statute of limitations. *Stevens v. Lake*, 615 So.2d 1177, 1183 (Miss. 1993)(quoting C.J.S., *Limitations of Actions* § 177 at 230-31 (1987)).

95. As the Plaintiff(s) and population continue to be subjected to repeated and continuous TCE exposure as a result of the Defendants wrongful conduct, each day constitutes a continuing course of conduct for the Defendants, for which no statute of limitations defense may be raised.

### Count 7: Latent Injuries

96. The nature of the injuries caused by exposure to TCE over prolonged periods of time causes latent injuries to occur, similar to how asbestos exposure causes injuries to physically manifest themselves decades following exposure. Latent injuries in the State of Mississippi are subject to the discovery rule. Miss. Code § 15-1-49; *Raddin v. Manchester Educational Foundation, Inc.,* 175 So.3d 1243 (Miss. 2015).

97. Even without Mississippi's own laws allowing for the use of the discovery rule, federal courts have found that in the context of hazardous waste cites and torts brought in relation to the harms caused by such pollution, federal preemption applies to any potential states statute which might limit liability beyond that accorded under the discovery rule contained within federal pollution statutes. *See* 42 U.S.C. § 9613(f); *Steego Corp. v. Ravenal*, 830 F.Supp. 42, 47 (D. Mass. 1993); *U.S. v. Sharon Steel Corp.*, 681 F.Supp. 1492, 1496 (D. Utah 1987); *Freudenberg-NOK Gen. Partnership v. Thomopoulos*, 35 Env't Rep. Cas. (BNA) 1461, (D. N.H. 1991).

98. Accordingly, any state statute of limitations is subject to federal preemption to the extent it may limit causes of action brought by the Plaintiff(s) in a fashion not compliant with federal guidance and authority.

### Count 8: Products Liability

99. Defendant Detrex Corporation was the manufacturer and distributor of the equipment and solvents responsible for the TCE pollution and exposure through the greater Water Valley area.

100. Defendants EnPro Industries and EnPro Holdings served as a user of those products downstream in the stream of commerce.

101.    Defendants Italmatch SC, LLC, and Italmatch DW, LLC, were formed for the purposes of the purchase, acquisition, and or merger with Detrex Corporation. The traditional rule is that a corporation or entity that acquires manufacturing assets does not that the liabilities of the predecessor company from where the assets were acquired, for the purposes of products liability.  However, the State of Mississippi recognizes four exceptions to this rule.  Those exceptions are: 1) when the successor expressly or impliedly agrees to assume the liabilities of the predecessor; 2) when the transaction may be considered a de facto merger; 3) when the successor may be considered a "mere continuation" of the predecessor; or 4) when the transaction was fraudulent.  *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168 (5th Cir. 1985); *Harris v. New Werner Holding Co., Inc.*, 390 Fed. Appx. 395 (5th Cir. 2010); *Scordino v. Hopeman Bros., Inc.*, 662 So.2d 640 (Miss. 1995); *Lemelle v. Universal Mfg. Corp.*, 752 F.2d 168 (5th Cir. 1994); *De Facto Merger of Two Corporations*, 20 Am.Jur. Proof of Facts 2d 609 (1979).  The Plaintiffs have cause to believe that those exceptions apply to the acquisition/merger of Dextrex Corporation by the Italmatch entities formed in Delaware during the purchase of Dextrex Corporation in 2017.

102.    The defendants referenced under this count each are subject to product liability claims for failure to warn or inadequacy to warn of the true nature of the hazards of exposure and pollution to humans from contact with TCE from the purchase and use of the products created by Detrex Corporation.  While some warnings in relation to exposure to TCE may have been made, they either fully failed or drastically were inadequate in providing any warning about the nature of long-term pollution, the carcinogenic effects of TCE, or the various other horrific health and nervous system issues that are and were known to be associated with exposure to TCE.

103.    Accordingly, the defendants are each liable for the damages TCE exposure has caused to the Plaintiffs as a result of the use and exposure to a dangerous and defective product.

**Count 9: Medical Monitoring Damages**

104.    The State of Mississippi does not have any statutes or common law that expressly allows legal theories sounding in the doctrines of medical monitoring claims for those exposed to chemicals or substances which may increase their potential for future medical harms.  However, the Supreme Court has

directly addressed this question and authorized the potential for recoveries of damages under these legal theories in limited circumstances. *Paz v. Brush Engineered Materials, Inc.*, 949 So.2d 1(Miss. 2007).

105. In discussing the handling of similar arguments, the Supreme Court made clear that such claims may be allowed to the extent that Plaintiffs may establish willful, wanton, or intentional nature of the injuries, or prove the validity of damages arising from such conduct.

106. To the extent that the claims of the Plaintiffs may prove such conduct, the Plaintiffs seek to request that the Court consider and grant such damages within the confines of the language described by the Supreme Court.[12]

## PUNITIVE DAMAGES

107. Because Defendants' above-described acts of creating, transporting, and the ultimate discharging of trichloroethylene into the environment constitutes willful, wanton, and/or reckless disregard for the safety of others, Defendants are liable to Plaintiffs for punitive and/or exemplary damages.

## DAMAGES

108. As a direct and proximate result of Defendants' tortious conduct, the Plaintiffs have suffered and sustained the following injuries and damages for which Plaintiffs seek an award in an amount to proven at trial:

      a. Past, present, and future damages for physical and personal bodily injuries for which they have sought and continue to seek medical treatment, all of which have caused them to endure, and continue to endure, immense physical pain, suffering, and mental anguish;

      b. Past, present, and future pain, mental and emotional distress, anguish, depression, anxiety and loss of enjoyment and freedoms of public and private life;

---

[12] Counsel for the Plaintiffs recognize that this is not a truly independent cause of action, as described by the referenced case's description. However, given the limited nature of the case law on this issue in Mississippi since the issuance of the referenced case, this issue has been fashioned as an independent count for the purposes of pleading simply to properly alert the Court and defendants to this case of the potential availability of arguments for medical monitoring damages.

    c.     Past, present, and future medical expenses;

    d.     Past, present, and future lost wages;

    e.     Past, present, and future loss of earning capacity;

    f.     Permanent disability and diminished life expectancy;

    g.     Pre-judgment interest;

    h.     Punitive and/or exemplary damages; and

    i.     All other damages proven at trial and/or allowed by law, rule, or equity.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a jury trial as to all issues so triable.

## PRAYER FOR RELIEF

109.    Plaintiffs pray for judgment of and from Defendants, jointly and severally, for monetary damages to make Plaintiffs whole, together with interest, expenses, costs of suit, attorney fees, as appropriate, and all such other relief as the Court deems just and proper, including:

    a.     Compensatory damages to Plaintiffs for their past, present, and future (1) physical and personal bodily injuries, (2) medical expenses, (3) immense physical pain, suffering, and mental anguish, (4) lost wages, (5) disability, and (6) diminished life expectancy;

    b.     Full compensatory damages to the Plaintiffs for past, present, and future special damages as allowed by law;

    c.     Exemplary or punitive damages against Defendants under the law of the State of Mississippi;

    d.     All other damages allowed by law, rule, or equity.

**THIS**, the 31st day of March, 2025.

> **ODESTER ANDREWS, EXCELL VANCE, JOSEPHINE MARTIN, EDDIE FOSTER, BILLY HARRIS, JOAN BERRYHILL, PATRICIA CAMP, AND CLAYFERS WALTON**

31

*/s/ Andrew F. Tominello*
**GEORGE F. HOLLOWELL, JR. (MSB # 2559)**
**ANDREW F. TOMINELLO (MSB #104183)**
HOLLOWELL LAW FIRM
P.O. Drawer 1407
Greenville, MS  38702-1407
Telephone: (662)378-3103
Facsimile: (662) 378-3420
E-mail: gfh@hollowelllawfirm.com
        aft@hollowelllawfirm.com